64 F.3d 657
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Neil GOODMAN, Plaintiff-Appellant,
v.
STATE OF MARYLAND DEPARTMENT OF SOCIAL SERVICES; Dotcenia
Phears, individually and in her official capacity as
Management Supervisor Institutional Care H-95; Herbert
Locklear, individually and in his official capacity as
Director, Medical Assistance Unit; the Maryland State
Department of Human Resources, Defendants-Appellees.
 No. 94-2133.
 United States Court of Appeals, Fourth Circuit.
 Argued May 2, 1995.
Decided Aug. 23, 1995.
 
 ARGUED: Elizabeth Colette, LAW OFFICES OF BONNIE L. WARNKEN, Baltimore, MD, for Appellant. Sandra Irene Barnes, Assistant Attorney General, Baltimore, MD, for Appellee. ON BRIEF: Byron L. Warnken, LAW OFFICES OF BONNIE L. WARNKEN, Baltimore, MD, for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, MD, for Appellee.
 Before ERVIN, Chief Judge, and NIEMEYER and MICHAEL, Circuit Judges.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 Neil Goodman, a white man formerly employed by the Baltimore City Department of Social Services ("BCDSS"), appeals the dismissal of his racial and sexual discrimination suit against the State of Maryland and BCDSS supervisors Herbert Locklear and Dotcenia Phears. Goodman alleges that the defendants treated him differently based on his race and gender, fostered or tolerated a hostile work environment, and retaliated against him for engaging in statutorily protected activities, thereby violating his rights under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. Sec. 2000e. Because Goodman has failed to present evidence of discrimination against him by the defendants sufficient to create a genuine issue of material fact, we affirm the district court's grant of summary judgment in favor of the defendants.
 
 I.
 
 2
 From December 1989 to October 1990, Neil Goodman was employed by the BCDSS in the Community Medical Assistance Unit of its Medical Assistance Program. In October, Goodman was reassigned within the same program to the Long Term Care Unit. The precise racial and gender composition of the Long Term Care Unit is not a part of the record. The unit's supervisor was Dotcenia Phears, an African-American woman. Three other supervisors worked under her, one of whom was Goodman's immediate superior. Phears, as well as the Supervisor of the Community Medical Assistance Unit, reported to a Native-American man named Herbert Locklear.
 
 
 3
 In November of 1990, Goodman sent a memorandum to the supervisor of the BCDSS General Services Office stating that Clarence Ward, an African-American employee who worked in General Services, was racially harassing him. According to Goodman, Ward had stated that he "did not like the fact that he had lost another woman to a white man." Goodman also indicated that Ward had conducted himself towards Goodman in a threatening manner, although no more specific allegations were offered. Goodman sent copies of the memorandum to his immediate supervisor and to Locklear. Locklear then contacted Ward's supervisor, who informed Locklear that the parties had met and the matter had been resolved. According to Goodman, Phears directed Goodman not to bring any additional concerns to her directly, but to follow the established chain of command when acting on any grievances he might have.
 
 
 4
 While assigned to the Long Term Care Unit, Goodman became involved in a relationship with a black female co-worker, Shelly McPherson. In June of 1991, McPherson sent Goodman a note thanking him for his "gifts, [his] patience, and[his] time." The otherwise friendly letter ended with: "But this thing with Doris has got to stop or else you're dead." There is no information in the record regarding Doris' identity, nor were the parties able to elaborate further at oral argument. Approximately six months later, after her relationship with Goodman had ended, McPherson went to Phears to complain that she was being sexually harassed by Goodman. McPherson informed Phears that Goodman repeatedly had sent McPherson unsolicited correspondence, that neighbors had seen Goodman outside of her apartment building, and that Goodman possessed a gun, frequently carried a six-inch knife, and had threatened to use weapons in the past. Responding to McPherson's concerns, Phears contacted the office building's private security company and held a meeting with Goodman. He admitted that he had tried to correspond with McPherson but denied having harassed her. Goodman presented the aforementioned letter from McPherson as evidence "establishing voluntary written communication on the part of Ms. McPherson." In response to McPherson's complaint, Phears sent memoranda to all staff under her supervision stating that she would not tolerate sexual harassment in the workplace, that employees should limit their conversations with one another to work-related topics, and that the carrying of weapons on the premises was forbidden. According to Goodman, security guards frisked him for weapons on one occasion and "[f]or a period of 2 months, checked [him] at [his] desk in full view of co-workers." In addition, Locklear directed that Goodman had to leave the building by a certain time each day, which prevented him from working late.
 
 
 5
 As part of a program decentralizing the Community Medical Assistance Units, the Long Term Care Unit was required to designate two workers and one supervisor for re-assignment. Locklear and Phears determined that workers with the least experience in the Long Term Care Unit or individuals who had worked in the Community Medical Assistance Unit most recently should be selected. In addition, one worker would come from each of the two sub-units (called "applications" and "continuing") of the Long Term Care Unit. Locklear delegated to Phears the specific decisions about which employees should be transferred. As possible candidates for transfer, Phears identified an African-American volunteer and Goodman. When the volunteer could not be transferred for a technical reason, Phears chose a white woman with experience in the Community Medical Assistance Unit. The reassignments had no effect on the employees' job classifications or salaries. Goodman filed grievances regarding the proposed transfer, as well as a sexual harassment complaint against Locklear.
 
 
 6
 Goodman received his new field assignment in March of 1992. On the last day of that month, Goodman advised BCDSS that he would be transferring to a position with the Baltimore County Department of Social Services. He stated that his decision to leave BCDSS was based on the fact that he "was given no choice as to where [he] would be transferred." Goodman also expressed concern that "a negative image would follow [him] to a new site." The move from one state position to another had no impact on Goodman's salary or his job classification.
 
 
 7
 On January 27, 1994, Neil Goodman filed this action in the United States District Court for the District of Maryland seeking compensatory and punitive damages, attorneys' fees, and injunctive relief from alleged racial and sexual discrimination. Defendants named in an amended complaint were the Baltimore City Department of Social Services and two of its employees, Dotcenia Phears and Herbert Locklear.[1] After oral argument on the motion, the district court granted defendants' motion for summary judgment because Goodman could not, as a matter of law, establish a prima facie case of employment discrimination. The court found that the disciplinary actions taken against Goodman were not discriminatory, that Goodman failed to rebut the legitimacy of the criteria by which he was chosen for transfer to a different unit, and that the intolerable conditions necessary to state a constructive discharge claim did not exist in this case. Goodman filed timely notice of appeal to this court.
 
 II.
 
 8
 We review the district court's grant of summary judgment de novo. Ramos v. Southern Md. Elec. Coop., 996 F.2d 52, 53 (4th Cir.1993). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir.1990). In making this determination, we view the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 233 (4th Cir.1991). "If, however,'the evidence is so one-sided that one party must prevail as a matter of law,' we must affirm the grant of summary judgment in that party's favor." O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 545 (4th Cir.1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).
 
 
 9
 Goodman contends that summary judgment is improper because he established a prima facie case of racial and sexual discrimination based on disparate treatment. To state this type of claim, a plaintiff is required to prove that he was a member of a protected class, suffered an adverse employment decision, and was treated differently than similarly situated persons outside the class. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The parties dispute the racial composition of the relevant work force, implicitly assuming that Goodman would not be protected under Title VII if whites and men constituted a majority of the Long Term Care Unit. Most cases interpreting Title VII, however, can be read as prohibiting racial and sexual discrimination regardless of an individual's majority or minority status. See McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976) (noting that "Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable were they Negroes"); Lucas v. Dole, 835 F.2d 532, 533-34 (4th Cir.1987) (declining to decide whether plaintiffs from majority groups must meet a higher burden, but recognizing that they are protected under Title VII). Thus, regardless of the composition of the work force, we accept the trial court's reasoning and assume without deciding that Goodman is a member of a protected class under the McDonnell Douglas test.
 
 
 10
 Goodman fails to satisfy the test's other two basic requirements, however. With respect to the second element, Goodman's reassignment does not qualify as an adverse employment decision. Importantly, his salary and job classification would have remained the same after his transfer. We recognize that an employee could be subjected to a negative action that did not alter his official status. In this case, however, Goodman presented no evidence that the new position negatively affected him. Furthermore, Goodman's half-hearted attempt to frame his resignation from BCDSS as a constructive discharge--the adverse employment decision underlying that type of claim--certainly fails. To prove constructive discharge, an employee must demonstrate the deliberateness of the employer's action and the intolerability of working conditions. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th Cir.1995). "Deliberateness exists only if the actions complained of 'were intended by the employer as an effort to force the employee to quit.' " Paroline v. Unisys Corp., 879 F.2d 100, 114 (4th Cir.1989) (Wilkinson, J., dissenting) (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir.1985)), vacated in part and dissenting opinion adopted in Paroline v. Unisys Corp., 900 F.2d 27 (4th Cir.1990). There is no evidence that the BCDSS's actions were intended to force Goodman to resign. Furthermore, the environment Goodman presents does not as a matter of law rise to the level of "intolerable conditions" necessary to establish a claim of constructive discharge. Even Goodman admits that he was frisked by security officers only once,[2] after McPherson expressed concern that Goodman carried weapons at work. In addition, Goodman recounts a single incident of explicitly racial or sexual badgering at work: the comment from Charlie Ward about "los[ing] another woman to a white man." While evidence of racial and sexual hostility can be aggregated in assessing an environment, Hicks v. Gates Rubber Co., 833 F.2d 1406, 1416 (10th Cir.1987), here there is little to combine.
 
 
 11
 Regarding the third element of the McDonnell Douglas framework, Goodman has not offered evidence that he was treated differently than non-white or female employees. Essentially, he attempts to state a disparate discipline claim by describing the dissimilar way in which the supervisors of the Long Term Care Unit dealt with his allegations of harassment. A plaintiff attempting to establish prima facie proof of disparate disciplinary practices must show that "the prohibited conduct in which [he] engaged was as serious as the misconduct of employees outside the protected class; and ... [that] the employer imposed harsher disciplinary measures against plaintiff than against employees outside the protected class." Carter v. Ball, 33 F.3d 450, 461 (4th Cir.1994); Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir.1993). In contrast to Ward and McPherson, who apparently were not disciplined, Goodman was frisked once, told not to remain late after work, and asked to refrain from talking with co-workers about non-professional matters. His allegations of harassment, however, were substantially less serious than McPherson's, who asserted that Goodman posed a danger to the physical safety of his co-workers.
 
 
 12
 McPherson's note to Goodman can also be characterized as less significant than her allegations against Goodman, particularly since he did not bring the letter to his supervisor's attention until six months after receiving it, and even then did not characterize it as threatening. The single incident with Ward--in which he complained about "losing another woman to a white man"--was relatively trivial, and notably, Locklear was not Ward's supervisor. Locklear's response of informing Ward's immediate superior about Goodman's allegations seems to us entirely appropriate. Overall, the various allegations of harassment are sufficiently distinct to prevent Goodman from establishing a disparate discipline case based on the diverse way the complaints were handled. Goodman, therefore, has failed to establish a prima facie case of disparate treatment.
 
 
 13
 The defendants also were entitled to summary judgment because Goodman failed to overcome the legitimate nondiscriminatory reasons they gave for their actions towards Goodman. See Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316-17 (4th Cir.1993). Goodman presented no evidence that the criteria used to determine the employees who would be transferred from the Long Term Care Unit were directed against him. In contrast, the defendants presented significant evidence that they adopted and followed neutral criteria in selecting the employees to be reassigned. While we construe the evidence in Goodman's favor at this stage, the " 'mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " O'Connor, 56 F.3d at 545 (quoting Anderson, 477 U.S. at 252). Additionally, no reasonable trier of fact could find that Phears did not have a legitimate reason to investigate the allegations of sexual harassment by McPherson. Goodman's reliance on St. Mary's Honor Ctr. v. Hicks, --- U.S. ----, 113 S.Ct. 2742 (1993), as precluding summary judgment is misplaced. In that case, the Supreme Court held that a plaintiff alleging disparate treatment is not entitled to a verdict simply by rebutting the legitimate nondiscriminatory reasons proffered by the defendant. Id. at 2749. St. Mary's Honor Ctr. is immaterial to this case, in which Goodman failed to rebut the defendants' non-discriminatory reasons for the employment decisions they made.
 
 III.
 
 14
 Goodman further contends that the grant of summary judgment in favor of the defendants was inappropriate because he was subjected to a hostile work environment, in violation of Title VII.[3] To establish a hostile environment claim, a plaintiff must show that the harassment was unwelcome, based on membership in a protected class, and sufficiently severe or pervasive to create an abusive working environment; he must also establish that the employer had constructive or actual knowledge of the environment, but took no prompt and remedial action. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986); Swentek v. USAir, Inc., 830 F.2d 552, 557-58 (4th Cir.1987). The plaintiff does not have to demonstrate that he suffered psychologically injurious injury. Harris v. Forklift Sys., --- U.S. ----, 114 S.Ct. 367, 371 (1993). Factors affecting whether an environment is sufficiently hostile include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. For the reasons discussed above regarding constructive discharge, the facts presented by Goodman fail as a matter of law to constitute a hostile environment.
 
 IV.
 
 15
 Finally, Goodman argues that summary judgment was improper because he created a genuine issue of material fact that he was retaliated against illegally for engaging in a protected activity. In order to state a prima facie claim for retaliation, a plaintiff must establish that he undertook a protected activity, that his employer responded adversely, and that a causal connection existed between the two. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir.1991). Other than the proposed transfer, Goodman presented no evidence of any potentially adverse employment decision taken in retaliation for his filing a sexual discrimination claim against Locklear and complaining about racial harassment by Ward. As noted above, we do not view this transfer as an unfavorable act. Moreover, even if it had been, the defendants presented sufficient evidence of legitimate reasons for their decision, which Goodman failed to rebut.
 
 V.
 
 16
 Accordingly, the district court's grant of summary judgment in favor of the defendants is
 
 
 17
 AFFIRMED.
 
 
 
 [1]
 Goodman originally sued the "State of Maryland Department of Social Services," an agency that does not exist. The amended complaint named the "Maryland State Department of Human Resources, Social Services Administration, Baltimore City Department of Social Services." Because we find Goodman's claims to be without merit, we do not address the appellees' contention that the complaint against the state agency should be dismissed on the grounds that BCDSS is an entity separate from the Maryland Department of Human Resources
 
 
 [2]
 Moreover, the security officers in Goodman's building worked for a private company, not BCDSS
 
 
 [3]
 Goodman did not raise specifically either a hostile environment or retaliation theory of recovery before the court below. In general, " '[q]uestions not raised and properly preserved in the trial forum will not be noticed on appeal, in the absence of exceptional circumstances.' " Bakker v. Grutman, 942 F.2d 236, 242 (4th Cir.1991) (quoting United States v. One 1971 Mercedes-Benz, 542 F.2d 912, 915 (4th Cir.1976)). One can argue plausibly, however, that the claims were raised sufficiently under the more general rubric of racial and sexual discrimination violative of Title VII. Because Goodman's arguments fail on the merits, we leave for another day a determination regarding the specificity with which a "hostile environment" or "retaliation" claim under Title VII must be pleaded