**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TIFFANY MOSBY-GRANT,

     *Plaintiff-Appellant,*

v.

CITY OF HAGERSTOWN,

     *Defendant-Appellee.*

No. 09-2161

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson Everett Legg, Chief District Judge.
(1:07-cv-01940-BEL)

Argued: October 28, 2010

Decided: December 20, 2010

Before NIEMEYER and GREGORY, Circuit Judges,
and Damon J. KEITH, Senior Circuit Judge of the United
States Court of Appeals for the Sixth Circuit,
sitting by designation.

Reversed in part and remanded by published opinion. Judge
Gregory wrote the majority opinion, in which Senior Judge
Keith joined. Judge Niemeyer wrote a dissenting opinion.

**COUNSEL**

Brian M. Maul, GORDON & SIMMONS, LLC, Frederick, Maryland, for Appellant. Matthew Douglas Peter, Hanover, Maryland, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

Tiffany Mosby-Grant, an African American female and former recruit enrolled at the Western Maryland Police Academy (hereinafter the "Academy"), sued the City of Hagerstown (hereinafter the "City") alleging violations of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-2(d). Mosby-Grant brought separate race and sex claims alleging that her instructors and classmates at the Academy created a hostile work environment. The district court awarded summary judgment to the City. After considering Mosby-Grant's appeal, we reverse the grant of summary judgment on her sexual harassment claim. However, we affirm the grant of summary judgment on her race claim.

I.

A.

Mosby-Grant, the plaintiff-appellant, was enrolled in the Academy from January 9, 2006 until May 25, 2006. The Academy provides training to individuals seeking employment as law enforcement officers, and is operated by the Hagerstown Police Department ("HPD"). The HPD is an organ of the City, the defendant-appellee.

Students enroll in the Academy in one of two ways. Sponsored students are provisionally hired by a local police depart-

ment pending their successful completion of the Academy's curriculum. The sponsoring police department pays the tuition of its sponsored students. Unsponsored students voluntarily enroll in the Academy and have not yet been hired by any law enforcement agency. These students are responsible for paying their own tuition. Mosby-Grant was an unsponsored student and responsible for her own tuition while at the Academy.

Mosby-Grant had also begun the formal process of applying to become an HPD officer, passing an initial examination and participating in an interview. If she had passed her firearms qualification test, the City would have hired her. Ex. 3 (Kline Aff. ¶ 12), Def.'s Mem. Supp. Summ. J., *Mosby-Grant v. City of Hagerstown*, No. 1:07-cv-01940 (Aug. 20, 2007).[1]

Mosby-Grant started at the Academy with sixteen other recruits, all of whom were male. One of the other male recruits was bi-racial, partially of African American descent. All of the other recruits were white. For reasons unrelated to this case, one of the white male recruits withdrew during the first week.

In the three years prior to Mosby-Grant's enrollment at the Academy, only four women and no African Americans were enrolled. Between 2003 and 2006, there have only been two African American instructors at the Academy, out of a total of more than 100 instructors. There has never been an African American female instructor. Lieutenant Margaret Kline, a

---

[1]On appeal, neither party disputes that the City was Mosby-Grant's employer as defined by Title VII. The issue was raised by the City in its first motion for summary judgment, and was resolved in Mosby-Grant's favor by the district court. Mem. Denying Def.'s Mot. Summ. J., *Mosby-Grant v. City of Hagerstown*, No. 1:07-cv-01940, at *4, (Feb. 8, 2008) (citing 42 U.S.C. § 2000e-2(d); *Saville v. Houston County Healthcare Authority*, 852 F. Supp. 1512 (M.D. Ala. 1994); *Flores v. Hartford Police Dept.*, No. H-79-411, 1981 U.S. Dist. LEXIS 11484, at *1 (D. Conn. Feb. 17, 1981)).

white female and the current Director of the Academy, admitted that the Academy is not very diverse. However, as noted above, the Academy itself had no control over the enrollment.

During Mosby-Grant's first two weeks at the Academy, the recruits were told that they would have to pass a firearms test on qualification day in order to graduate. Around that time, recruits also attended sexual harassment training. Lieutenant Kline gave a presentation about the unfortunate history of sexual harassment at the Academy, and efforts by the Academy to prevent future harassment.

Until her final few weeks, Mosby-Grant had excelled academically at the Academy. Nonetheless, throughout the training course, Mosby-Grant was exposed to a number of serious instances of harassment by her peers and instructors. Mosby-Grant claims that this harassment led her to abandon the HPD's application process, and contributed to her failure to pass the final firearms qualification test.

### B.

Because Mosby-Grant was the non-movant in the summary judgment proceedings, we recite the following specific facts and examples that Mosby-Grant claims establish the existence of a hostile work environment at the Academy in the light most favorable to her. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While at the Academy, Mosby-Grant felt isolated by her peers on account of her sex. For example, Mosby-Grant often had trouble finding training partners when the Academy required one and felt shunned by her cohorts. She was unpopular amongst her peers because of her disinterest in participating in their "juvenile behavior," including some of the behavior described below, and her refusal to "gossip about people." Joint Appendix ("J.A.") 357.

Mosby-Grant once overheard a white male recruit tell the biracial recruit, "[w]here I'm from, people like you are strung up from a flagpole." J.A. 313-14. The white male recruit also made a comment about the biracial recruit "being dragged from the back of a truck." J.A. 317. Mosby-Grant did not hear what prompted the comments, and they were not directed at her.

Mosby-Grant immediately confronted the white recruit about the nature of his comments, and he apologized. When the two spoke again later in the day, Mosby-Grant explained how the comments had surprised and offended her. He apologized again, and told Mosby-Grant that he and the other recruit had been joking. Mosby-Grant had never heard him make any racially insensitive comments about African Americans in the past. She also never heard the recruit or anyone else at the Academy make any other inappropriate remarks about African Americans.

Mosby-Grant heard recruits use other racially charged remarks, including the terms "honky" and "cracker." J.A. 284, 313, 318-19. Specifically, Mosby-Grant heard another recruit refer to singer Britney Spears as "white trash" and "ghetto." J.A. 284. In addition to expressing to Lieutenant Kline her general sense of the difficult environment at the Academy, Mosby-Grant mentioned the comments about Britney Spears to Lieutenant Kline.

On at least two occasions, she also heard a recruit derogatorily refer to other recruits and passersby as "fucking Mexicans." J.A. 318-20. She does not recall whether instructors ever heard these particular comments, or whether she ever reported them.

Mosby-Grant had a minor altercation with a white male recruit while training. During an exercise drill, Mosby-Grant and the recruit reached for a ball that they were both instructed to retrieve. Mosby-Grant grabbed the ball first, but

the recruit snatched it from her. Mosby-Grant sought to grab the ball back from the recruit and, in the ensuing struggle, he bumped Mosby-Grant and scratched her wrist. Mosby-Grant yelled at the recruit to "calm down." J.A. 363. The male recruit was told by the instructors to sit out the rest of the exercise. It is not clear whether Mosby-Grant ever spoke to Lieutenant Kline about this incident.

Mosby-Grant heard the word "bitch" used by male instructors and other recruits on at least ten occasions over the course of her almost five months of training. J.A. 325. One day in the classroom, Detective Carl Hook used the word to describe a woman on the street. While recalling a moment where Hook and Mosby-Grant bumped into one another during a training exercise, Hook used the term to describe Mosby-Grant herself. Detective Hook began "I saw her, and it was like this bitch" and then continued the story. J.A. 329. Although uncomfortable with the comments, Mosby-Grant did not discuss it with Lieutenant Kline.

Between classes or during down time, other recruits would often sing a song that included the phrase "asses, titties and big booty bitches" in Mosby-Grant's presence. J.A. 323. This song was never sung in class. Mosby-Grant does not know whether instructors ever heard it sung by recruits, and she never brought it to Lieutenant Kline's attention.

Mosby-Grant also heard her fellow recruits use the word "bitch" on several other occasions either before class or during fitness training. J.A. 329. She does not recall the context of when she heard the word or whether instructors ever heard the word used by recruits, but it was likely not directed at her.

Indeed, Lieutenant Richard T. Reynolds, Lieutenant Kline's predecessor as Academy Director, testified that he would sometimes use the term in a "teaching" or "jocular" manner in front of recruits and, at times, that he had heard the word used by instructors and recruits alike. J.A. 675C-676.

As a part of a training session meant to instruct recruits on how to deal with an inebriated person, Lieutenant Michael King became intoxicated and the recruits were ordered to restrain him. During the session, Mosby-Grant heard Lieutenant King call a male recruit a "pussy" several times. J.A. 274-75. Mosby-Grant heard the statements, and reported them to Lieutenant Kline. Lieutenant Kline said she would "get back to the chief about this." J.A. 280. However, it is unclear what corrective actions, if any, were ultimately taken.

Mosby-Grant also often heard her classmates make crude comments about women passing by or visiting the Academy, specifically commenting on the women's physical appearances and parts of their anatomies. Mosby-Grant spoke to Lieutenant Kline about these incidents.

In April 2006, the recruits gathered outside of training to discuss the issues that they had with one another. Several recruits complained that Mosby-Grant was receiving "special treatment" because she was a woman. J.A. 355-56, 368. The recruits specifically mentioned that Mosby-Grant wore different pants with stripes, wore her hair in a ponytail allegedly inconsistent with the dress code, had been late to class, and had failed to participate in certain informal group activities. The other recruits also made comments about her eyelashes. Mosby-Grant informed the recruits of the reasonable explanations for her alleged dress code "violations." The pants were loaned to Mosby-Grant by Lieutenant Kline because the standard issue stripe-less pants did not fit her properly; her hair was in a ponytail in compliance with a recent change in the dress code; and Mosby-Grant had been given permission to be late in order to speak with Academy administrators about her problems paying tuition. No other recruit was subjected to similar criticisms at the meeting. Mosby-Grant felt singled out as the only woman.

Later that day, Mosby-Grant discussed the meeting with Lieutenant Kline. Kline informed Mosby-Grant that many of

her classmates were not in compliance with various dress code requirements, and that there would be stricter dress code enforcement. It is not clear whether Lieutenant Kline ever took any action to correct the recruits' behavior.

During her participation in the Emergency Vehicle Operation Course ("EVOC"), Mosby-Grant observed several recruits snickering and making critical comments. No recruit laughed or snickered as the males completed the course.

Unbeknownst to Mosby-Grant at the time, the other recruits were directed by Academy instructors to go inside a trailer and close the windows and blinds while Mosby-Grant completed the EVOC training. The instructors were concerned that the recruits' snickering was disturbing Mosby-Grant.

After the course, Detective Casey Yonkers, an instructor, approached Mosby-Grant and told her that, in his estimation, Mosby-Grant was "being excluded" by the others, and he did not like it. J.A. 233-34. Yonkers told Mosby-Grant that he had "never seen anything like this during [his] time of training or doing the [EVOC] course." J.A. 234. He also observed that this had been "the worst team-effort support" put forth by recruits for another recruit that he had ever seen. J.A. 234. Hearing this, Mosby-Grant began to cry, and Yonkers said that he would bring his concerns to Lieutenant Kline. Mosby-Grant herself also complained to Lieutenant Kline.

During domestic violence training and in front of instructors, several of Mosby-Grant's fellow recruits belittled the value of the training. Specifically, they said that women "cry this or that" and then after they call the police "they just go back to the same guy who just beat them up." J.A. 308. Another day, during physical training, instructors asked the male recruits how they felt about domestic violence classes. The recruits responded that the training was boring and repeated their comments about female victims returning to their assailants. Mosby-Grant brought the comments to Lieu-

tenant Kline's attention, and Kline responded, "You know they're going to see. When they get out there, they're going to see it's not the same." J.A. 311-12. Lieutenant Kline took no steps to correct the recruits.

On approximately five occasions, Mosby-Grant overheard her classmates discussing a sexual encounter that at least one recruit had with a drunken sixteen year-old girl. Mosby-Grant heard the girl described as "crazy" by a recruit. J.A. 255. In one instance, the entire class was sitting together during a lunch break when some of the recruits began discussing their last encounter with the girl. The recruits called the girl a "homeless girl" and a "magician" because she had a rabbit and dog with her. J.A. 262-63. Mosby-Grant never found any of the terms used to describe the girl derogatory.

Chris Nicholson, a recruit Mosby-Grant was friendly with, also approached Mosby-Grant to speak with her about the girl. He confided in her as a friend because he was concerned about the other recruits' behavior. She listened to Nicholson, and shared his concern.

On five to ten occasions, the male recruits baselessly referred to a one-legged woman who frequently wandered outside of the recruits' hotel as a "prostitute" and "dope fiend." J.A. 264-66. On at least one occasion, Mosby-Grant also heard recruits laugh at an elderly woman when she mispronounced an officer's name while asking for directions and refer to the woman as "crazy." J.A. 321-22.

Mosby-Grant overheard other recruits discussing pornographic movies on three or four occasions. Mosby-Grant also overheard a recruit talking about bringing pornography to the Academy to share with others. However, none of her classmates ever discussed pornography with her or showed her any pornography.

Captain Moulton, Lieutenant Kline's superior, wanted Mosby-Grant kicked out of the Academy because of Mosby-

Grant's problems paying tuition. Kline also allegedly told Mosby-Grant that other recruits were in similar financial straits, but had not been threatened with expulsion by Captain Moulton.

All recruits had two weeks of firearms training. Prior to firearms training, Mosby-Grant had never fired a weapon before. She was aware, however, that, in order to graduate, each recruit had to pass a firearms test on qualification day.

All of the instructors who worked with Mosby-Grant during firearms training "were very obliging in their teachings and suggestions." J.A. 585. Her instructors were very kind and considerate of [her] needs." J.A. 585. Mosby-Grant and one other recruit received significant one-on-one training. Lieutenant King, the lead firearms instructor, testified that Mosby-Grant received more practice than any other student, including extra practice on qualification day. While working with Mosby-Grant, Lieutenant King told Mosby-Grant that he would "get [her] through this," i.e. the firearms course. J.A. 292, 691B. The day before qualification day, Mosby-Grant was performing at a level necessary to pass her timed firearms test.

However, on qualification day, Mosby-Grant failed to achieve the scores necessary to pass. While attempting to pass the test, Mosby-Grant overheard the other recruits chattering and laughing. Although Mosby-Grant did not know what they were discussing, all of the other recruits had qualified by this time.

Mosby-Grant believes that her negative experiences at the Academy and the ridicule she was exposed to on qualification day led her to fail. Lieutenant King testified that he believed "stress" and the time constraints on qualification day caused Mosby-Grant to fail the test. J.A. 691-91B. Sergeant Wood, another firearms instructor, also testified that "stress" and

Mosby-Grant's loss of focus during the test led to her poor performance. J.A. 693A.

As recalled above, Mosby-Grant made Lieutenant Kline, the Academy Director, aware of her concern that she was being treated differently because of her sex and/or race. Lieutenant Kline also testified that she had several conversations with Mosby-Grant about how Mosby-Grant "was uncomfortable with being considered different." J.A. 695A-95B. According to Lieutenant Kline, Mosby-Grant was different because she was "a black female." J.A. 696C-97.

On May 30, 2006, after Academy training had ended, Mosby-Grant sent a detailed memorandum about her negative experiences to Lieutenant Kline. However, Mosby-Grant admits that, during training, she did not bring all of her concerns to Lieutenant Kline.

Mosby-Grant would leave the Academy everyday in tears. As a result of her experiences at the Academy, Mosby-Grant has suffered from sleeplessness, loss of focus at work, low self-esteem, and fear of retaliation. Dr. Christiane Tellefsen is Mosby-Grant's expert and a board certified forensic psychiatrist. Dr. Tellefsen believes that Mosby-Grant's experiences at the Academy caused her to develop chronic Adjustment Disorder with Depression and Anxiety, which will require further treatment.[2] J.A. 703-710.

## C.

On August 23, 2006, Mosby-Grant filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against the City for violations of Title VII. Upon receiving her right to sue notice, Mosby-Grant initiated a lawsuit, specifi-

---

[2]Dr. Michael Spodak, the City's expert psychiatrist, also examined Mosby-Grant; but does not believe her experience caused any "psychological or emotional illness or disorder." J.A. 733-40.

cally alleging sex- and race-based hostile work environment claims, in the United States District Court for the District of Maryland on July 23, 2007.

On August 20, 2007, the City filed a motion to dismiss or, alternatively, for summary judgment. Mosby-Grant filed her opposition brief, and the City replied. On February 8, 2008, the district court denied the City's first motion for summary judgment.

On October 29, 2008, after discovery and depositions were completed, the City filed a second motion for summary judgment. On September 24, 2009, following briefing, the court granted the City's second motion for summary judgment. A timely appeal was filed on October 6, 2009.

II.

On appeal, we must decide whether the district court erred in dismissing Mosby-Grant's hostile work environment claims on summary judgment. "We review the district court's summary judgment ruling de novo, viewing the facts in the light most favorable to . . . the nonmoving party and drawing all reasonable inferences in her favor." *Doe v. Kidd*, 501 F.3d 348, 354 (4th Cir. 2007) (citation omitted).

We find that Mosby-Grant presented enough evidence for a reasonable jury to conclude that she was exposed to a hostile work environment because of her sex. To demonstrate sexual harassment and/or a racially hostile work environment, a plaintiff must show that there is "(1) unwelcome conduct; (2) that is based on the plaintiff's sex [and/or race]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Connor v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 192 (4th Cir. 2000) (citations omitted).

It is undisputed that the conduct was unwelcomed. The numerous complaints Mosby-Grant made to Lieutenant Kline about the conduct are enough to meet this prong. *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). However, the other elements are disputed and, therefore, are addressed in detail below.

## A.

### i.

Based on the facts, it is apparent that the other recruits' conduct was directed at Mosby-Grant because of her sex. A factual record that demonstrates that the workplace was contaminated with explicit and derogatory references to women provides an adequate basis for a plaintiff to show that the harassment occurred "because of" her gender. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000).

Here, Mosby-Grant, the only female recruit, was consistently made to feel like an outsider by her classmates and some instructors, with one instructor even referring to her as a "bitch." Mosby-Grant felt ostracized in part because of her classmates' "juvenile behavior," including their constant use of sexist language and disparaging remarks about women. In Mosby-Grant's presence, recruits would regularly sing sexually explicit lyrics, and describe women as "bitches," "prostitutes," "crazy," and "dope fiends," and denigrate the female victims of domestic violence. *See Jennings v. University of North Carolina*, 482 F.3d 686, 695-96 (4th Cir. 2007) (en banc) (finding that, in an analogous Title IX case, the plaintiff had demonstrated a hostile environment where most of the sexist comments were directed at others); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) ("We are . . . concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and [the harasser]."). Although the sexist language was rarely

directed at Mosby-Grant herself, her classmates explicitly told Mosby-Grant that they felt she was "asking for special treatment because [she is] a woman." The male recruits also noticeably singled Mosby-Grant out for special scorn during trainings. Given these facts, a reasonable jury could find that Mosby-Grant was targeted because of her sex. *See Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331-33 (4th Cir. 2003) (holding that coworkers' "sex-laden and sexist talk and conduct," such as the singing of offensive lyrics, in the presence of the plaintiff, the workplace's only woman, constituted sex-based harassment).

ii.

Mosby-Grant also suitably established that some of the unpleasant encounters between her and the other recruits were the result of race-based enmity. "To establish a hostile environment claim, [the plaintiff] must show that 'but for' his race . . . , he would not have been the victim of the alleged discrimination." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). The references of recruits to the historical lynching of African Americans, in particular, the brutal murder of James Byrd, Jr.[3], and their use of derogatory terms like "fucking Mexicans," "honky," and "ghetto" demonstrate that there was a level of racial hostility at the Academy. These comments are enough to suggest that the recruits' conduct was motivated by race.

---

[3]The recruit's comment about "being dragged from the back of a truck" was an apparent reference to Byrd's racially motivated murder on June 7, 1998. Byrd's murder was widely reported and became symbolic of "the horrors of racism." *10 years later, dragging death changes town*, MSNBC.com (June 6, 2008), http://www.msnbc.msn.com/id/25008925/38706994. Byrd, a 49-year-old African American man, was beaten by three white men who then chained him by the ankles to the bumper of a Ford pickup, and dragged him down the street. *Id.*

## B.

The work environment was severe or pervasive enough to sustain Mosby-Grant's sex claim, but not her race claim. In measuring whether the offensive conduct is severe or pervasive enough to warrant relief, we must look at the totality of the circumstances, including: the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). "[I]n the Fourth Circuit, the question of whether 'harassment was sufficiently severe or pervasive is quintessentially a question of fact.'" *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 773 (4th Cir. 1997) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990) (en banc)). Nonetheless, Title VII does not create a "general civility code" in the workplace; it only proscribes behavior that is "so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998); *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("[Sexual harassment law] is not designed to purge the workplace of vulgarity.").

### i.

Sexist comments were pervasive at the Academy and were frequently made to Mosby-Grant or in her presence. As noted above, throughout the short period Mosby-Grant spent at the Academy, she heard her fellow recruits brazenly and repeatedly describe a sexual encounter with a sixteen year-old girl. *See Jennings*, 482 F.3d at 697-99 (finding that the defendant's constant, open discussion of his sexual fantasies and the sex lives of the plaintiff and her teammates created a pervasively hostile environment). She also heard recruits and instructors

make dozens of references to women as "bitches," "crazy," "white trash," "ghetto," and "prostitutes," was called a "bitch" herself by an instructor, and was consistently subjected to selective taunting. *See Smith*, 202 F.3d at 242-43 ("A work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances."). When viewed cumulatively with the evidence of sex-based harassment, the recruits' use of racially charged terms like "honky," "cracker," and "fucking Mexicans" may also lead a jury to reasonably conclude that a discriminatory atmosphere was pervasive at the Academy. *See Spriggs*, 242 F.3d at 184 ("One of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987))).

The conduct was also severe and humiliating in as far as it caused Mosby-Grant significant emotional distress with Mosby-Grant openly becoming emotional at work and regularly leaving work in tears. The effect and source of the harassment were also noticeable to Mosby-Grant's superiors, including Detective Yonkers and Lieutenant Kline, and other recruits. *See Ocheltree*, 335 F.3d at 333 ("The 'severe or pervasive' element has both subjective and objective components." (citing *Harris*, 510 U.S. at 21-22)). Dr. Tellefsen's expert diagnosis may also support a reasonable finding that the Academy experience had an injurious effect on Mosby-Grant's mental health. *See Harris*, 510 U.S. at 22 ("Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct.").

Further, on at least one occasion, during the EVOC course, instructors had to intervene to prevent the male recruits' behavior from having an adverse affect on Mosby-Grant's

work performance. It may also be reasonable for a jury to infer, based on the testimony of Mosby-Grant, King and Wood, that the male recruits' snickering during firearms testing was directed at Mosby-Grant and, but-for that harassment, she would have succeeded on qualification day. *See Harris*, 510 U.S. at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include . . . whether it unreasonably interferes with an employee's work performance.").

Thus, Mosby-Grant presented adequate evidence for a reasonable jury to find that the work environment was infected with a severe or pervasive air of sex-based hostility that affected her conditions of employment.

ii.

However, Mosby-Grant lacks sufficient evidence to proceed on her race claim. Following the single incident wherein Mosby-Grant overheard racist comments, the offending recruit immediately apologized, and explained that he and the biracial recruit had been joking with one another. *See Harris*, 510 U.S. at 21-22 (finding that, to be actionable under Title VII, conduct must be subjectively and objectively offensive). Although another recruit did openly disparage Mexicans, his repugnant remarks were made only two times in five months and, although not dispositive, his remarks were also never directed at Mosby-Grant. *See Faragher*, 524 U.S. at 788 ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (citation and internal quotation marks omitted)).

We are keenly aware of the difficulties inherent in parsing out Title VII claims brought by individuals, e.g., African American women, who fall under more than one protected class. We also recognize that a hostile work environment claim can be bolstered by relying on evidence of a workplace

tainted by both sex and racial discrimination. *See Goodman v. State of Md. Dept. of Social Services*, No. 94-2133, 64 F.3d 657, 1995 U.S. App. LEXIS 23946, at *11 (4th Cir. Aug. 23, 1995) ("[E]vidence of racial and sexual hostility can be aggregated in assessing an environment . . . ." (citing *Hicks*, 833 F.2d at 1416)). Nevertheless, there are now two distinct counts before us, and the evidence of the pervasiveness or severity of racial animus at the Academy is too isolated and too minimal to survive summary judgment.[4] *Hartsell v. Duplex Products*, 123 F.3d 766, 773 (4th Cir. 1997).

## C.

Finally, the conduct was also imputable to the employer, particularly because, on many occasions, Mosby-Grant reported her concerns to superiors, including Lieutenant Kline, to no avail. Employers are generally subject to vicarious liability for Title VII cases; but, when an employee suffers no tangible direct employment action, the defendant-employer may raise an affirmative defense by showing: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807-808.

Here, Mosby-Grant repeatedly went to Lieutenant Kline,

---

[4]Because the issue was not raised by Mosby-Grant, we decline to address whether she would have been able to sustain a "hybrid" sex *and* race claim under Title VII. *Compare Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980) (holding that "discrimination against black females can exist even in the absence of discrimination against black men or white women") *with DeGraffenreid v. General Motors Assembly Division*, 413 F. Supp. 142, 143 (E.D. Mo. 1976), *aff'd in part*, *rev'd in part* on other grounds, 558 F.2d 480 (8th Cir. 1977) (denying the combined race and sex claims of African American female plaintiffs).

the Academy Director, to complain of the harassment. Despite Lieutenant Kline's and others' assurances that action would be taken, there is no indication that anything was done to discourage the most egregious conduct. Given the history of sexual harassment at the Academy, Mosby-Grant's position as one of only a very few women present at the Academy in any capacity in recent years, and Lieutenant Kline's and other instructors' actual knowledge of some of the objectionable conduct, the City had an obligation to intercede. However, the record is bereft of evidence demonstrating that any Academy administrator took affirmative steps to stop the harassment. For example, although Lieutenant Kline did discuss sexual harassment at the start of the Academy course, she never supplemented that training, nor took any other steps to demonstrate that reasonable care was undertaken to deter further hostility toward Mosby-Grant. In the one instance in which Academy instructors did respond, Mosby-Grant was merely segregated from her colleagues. Efforts to help Mosby-Grant were also seen by the other recruits as evidence that Mosby-Grant was receiving "special treatment." *See Central Wholesalers*, 573 F.3d at 177-78 (finding an employer potentially liable after the plaintiff made a number of complaints about harassment that the employer either failed to respond to or responded to ineffectively).

Under these circumstances, Mosby-Grant has made out a prima facie case that the Academy unreasonably failed to correct the offending behavior. Therefore, the City's entitlement to the affirmative defense is a triable issue of fact.

III.

Because there is a legally sufficient evidentiary basis for a reasonable jury to find that Mosby-Grant was the victim of sex-based employment discrimination, we conclude that the district court erred in granting the City's motion for summary judgment as a matter of law on her Title VII claim. The conduct Mosby-Grant was exposed to was unwelcomed; based on

her sex; severe or pervasive enough to alter the conditions of her employment; and directly imputable to her employer. Based on the evidence, however, a jury could not reasonably find that Mosby-Grant was subjected to race-based harassment. Accordingly, we reverse in part the grant of summary judgment of the district court and remand for further proceedings consistent with this opinion.

*REVERSED IN PART AND REMANDED*

NIEMEYER, Circuit Judge, dissenting:

A review of the record in this case discloses only a few isolated incidents occurring "because of" Mosby-Grant's sex, as regulated by 42 U.S.C. § 2000e-(2)(a)(1). As such, they are not severe and pervasive, as required to establish liability. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766 (4th Cir. 1997); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745 (4th Cir. 1996).

Moreover, of these isolated incidents, only three or four were brought to the attention of Lieutenant Margaret Kline, the director of the Academy. *See Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006) (An employer is liable for a coworker's sexual harassment only if it knew or should have known of the harassment and failed to take effective remedial action). For instance, Lt. Kline was told that on occasion, Mosby-Grant's classmates commented about the physical appearance and anatomy of women passing by or visiting the academy. She was told that on a particular occasion, classmates complained that women who are the victims of domestic violence "cry this or that" and then return to the man who beat them. And she was told that a male instructor had called a male recruit "pussy."

The only incident brought to Lt. Kline's attention which involved conduct directed at Mosby-Grant because of her sex occurred at a meeting where classmates claimed that Mosby-

Grant violated the dress code because she wore different pants (ones that fit) and wore her hair in a ponytail. They also made fun of her eyelashes. The conduct at this meeting was hardly severe and occurred on only one occasion.

In sum, the aggregation of incidents that may arguably be considered as a violation of 42 U.S.C. § 2000e-(2)(a)(1) present a work place environment far less severe and pervasive than those addressed in *Hartsell* and *Hopkins*, where we ruled against the complaining plaintiffs on the ground that the incidents were too isolated and too few to be severe and pervasive. In this case, I would likewise rule against Mosby-Grant for the same reasons. Because I would affirm the judgment of the district court, I respectfully dissent.