PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KATRINA OKOLI,

*Plaintiff-Appellant,*

v.

CITY OF BALTIMORE,

*Defendant-Appellee,*

and

JOHN P. STEWART, Executive
Director; MARTIN O'MALLEY,
Mayor; MICHAEL R. ENRIGHT, 1st
Deputy Mayor; COLM
O'COMARTUN, Special Assistant;
COMMISSION ON AGING &
RETIREMENT ED. (CARE);
MAYOR AND CITY COUNCIL OF
BALTIMORE,

*Defendants.*

No. 08-2198

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(1:06-cv-03025-WMN)

Argued: March 22, 2011

Decided: August 8, 2011

Before KING, GREGORY, and WYNN, Circuit Judges.

Vacated and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge King and Judge Wynn joined. Judge Wynn wrote a separate opinion concurring in part and concurring in the judgment.

---

**COUNSEL**

**ARGUED:** April Gordon Dawson, NORTH CAROLINA CENTRAL UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellant. David Eugene Ralph, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Appellee. **ON BRIEF:** George A. Nilson, City Solicitor, William R. Phelan, Jr., Chief Solicitor, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

Appellant challenges the grant of summary judgment for her employer when her boss forcibly kissed her, fondled her leg, propositioned her, asked sexually explicit questions, described sexual activities he wished to perform, and then, after she spurned the advances and filed a harassment complaint, fired her. Because those allegations are sufficient to make out claims of hostile work environment, quid pro quo harassment, and retaliation, we vacate and remand.

I.

We recite the facts, with reasonable inferences drawn, in favor of the non-movant, Katrina Okoli (Appellant-Plaintiff). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

John P. Stewart is the director of Baltimore's Commission on Aging and Retirement ("CARE") and serves in the Mayor's cabinet. On June 21, 2004, Stewart hired Okoli, an African-American woman, to serve as his executive assistant. The parties agree that for the first few months, Stewart and Okoli worked well together.

Beginning in September 2004, things changed for the worse: Namely, Stewart began propositioning Okoli to have sex with him in a Jacuzzi as part of his sexual fantasy. He first did so on September 13, 2004, during a visit to a CARE facility.[1] During a September 24, 2004 work meeting, Stewart then asked Okoli whether she was wearing any underwear, what color it was, and whether she would come to work the next day without underwear. Next, on October 4, 2004, Stewart told Okoli about a sexual experience he had with an African-American woman and her daughter. Okoli reacted with shock and disgust, which Stewart noticed. Another time, Stewart again mentioned this sexual experience with a mother and daughter. Okoli reiterated that the daughter would despise and regret having such a lewd sexual encounter with her mother. Stewart laughed it off and returned to work, as Okoli suggests he often did.

Stewart continued to proposition Okoli about his Jacuzzi fantasy, and on November 10, 2004, asked her to sit on his lap and to join him in a Jacuzzi in Las Vegas. Whenever Stewart traveled, he continued to request Okoli to join him in his Jacuzzi, and became angry when she rejected his advances.

---

[1]Also in September 2004, Stewart and others joked about various colleagues' sexual orientation. Okoli told Stewart she did not want to be a part of such conversations. Stewart gave Okoli a miniature American flag as a "[ ]sign of bigger and better things to come." J.A. 88. Stewart later gave or sought to give Okoli other gifts such as coats, lunch, and a holiday greeting card containing cash. When Stewart first started asking if Okoli had a similar Jacuzzi fantasy, she replied "no, not like that," and said she had not discussed Stewart's proposition for group sex with another colleague. J.A. 89.

Furthermore, Stewart touched Okoli's legs under the conference table "two or three times" during their morning meetings. J.A. 17B, 105-06, 319-20. Whenever this occurred, Okoli would move away from Stewart and tell him "don't do that." J.A. 17B. In November 2004, Okoli met with a manager about transferring to another department, and in January, Stewart gave her an "informal" performance review with areas of suggested improvement. J.A. 71-72.

On January 10, 2005, Stewart asked Okoli to come back in a conference room, then forcibly grabbed and kissed her. Okoli pushed him away and ran out the door. She was so distraught that she went home and remained there for the day. When she returned to work the next day, Okoli stressed to Stewart that she still wanted to have only a professional relationship. While he initially said "O.K.," Stewart repeated his Jacuzzi fantasy again that same day. J.A. 9, 17B, 90-91.[2]

Okoli then began reaching out for help in various ways, to no avail: On January 26, 2005, Okoli emailed Alvin Gillard, the Executive Director of the Baltimore Community Relations Commission, asking to speak with him about "a complaint." J.A. 149. Gillard never responded. On March 23, 2005, Okoli emailed Gillard with a "high" importance flag, stating her desire to "file a harassment complaint against my supervisor, Mr. John P. Stewart." J.A. 171-172. Gillard suggested she speak with an intake specialist during work hours. Okoli also emailed Michael Enright, the First Deputy Mayor, as well as Clarence Bishop, the Mayor's Chief of Staff, with a "high" importance request to meet with the Mayor as soon as possible. J.A. 176.

On April 1, 2005, Okoli sent a formal complaint to Mayor

---

[2]After January 2005, Stewart began criticizing Okoli's work more harshly, placed added demands on her schedule, spread rumors that she was a lesbian, and reminded her that she was an "at-will" employee. J.A. 17B, 90.

Martin O'Malley, copying Michael Enright and Clarence Bishop:

> . . . Mr. Stewart displayed unethical and unprofessional business characteristics, e.g., harassment, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues (anyone in the City government) and lack or disregard for integrity.

J.A. 197. Enright promptly forwarded that complaint on to Stewart through Enright's special assistant, Colm O'Comartun. Later that afternoon, Stewart fired Okoli.[3]

On April 3, 2005, Okoli approached Mayor O'Malley after a public speech and asked if he had reviewed her complaint; he said he had not, but would have someone look at it. In an April 5, 2005 memo to the Mayor, Stewart stated generally that he had "never been accused" of such sexual harassment in the past and denied the allegations in Okoli's April memo. J.A. 246-47. Stewart did not deny or address Okoli's specific allegations of sexual harassment in either of his two affidavits to the court.

A City human resources official, Kathy Phillips, met with Okoli on April 5, and said Okoli "shared three times in which she felt that she had been sexually harassed." J.A. 203. Phillips concluded her written summary of the meeting by stating, "I think this goes without saying but I strongly recommend that due to the nature of these allegations, a thorough investi-

---

[3]That morning, Okoli and Stewart also had a disagreement about when the two could meet. Stewart contends he drafted a termination letter on March 23, stemming from the disagreement he had with Okoli about meeting times. Stewart ended up not firing her then and revised his letter on March 24 and 30.

gation is necessary. It should be referred to an EEO Officer."
J.A. 208.[4]

On April 29, 2005, Okoli repeated the same allegations to
Yolanda Winkler in the Mayor's office, who referred her to
the Baltimore Community Relations Commission (BCRC).
On May 5, 2005, Okoli filed a charge of discrimination with
the BCRC, claiming harassment, retaliation, and "unsolicited
inappropriate touching." J.A. 212. On July 3, 2005, the Com-
mission dismissed the action for lack of probable cause that
Okoli had been discriminated against.

On September 26, 2006, Okoli initiated a pro se action
against Stewart, Enright, O'Comartun, the Mayor, CARE, and
the City Council of Baltimore (hereinafter, collectively known
as "the City"). She asserted claims under Title VII, 42 U.S.C.
§§ 1983, 1985, 2000e, common law, and Article 4 § 3-1 of the
Baltimore City Code.

On November 16, 2006, the City filed a notice of removal
to federal court, where Okoli amended her complaint. Both
parties moved for summary judgment and the district court
granted the City's motion. The court analyzed the same three
issues which arise in this appeal, hostile work environment,
quid pro quo harassment, and retaliation: First, regarding hos-
tile work environment, the court stressed that there were
"[j]ust three or four incidents [of physical contact] over a five
month period," and no physical threat to Okoli. J.A. 380. The
court also reasoned that Stewart ceased his conduct on his
own and "according to [Okoli's] own positive assessment of
her job performance, it is clear that she does not believe that
Stewart's conduct interfered with her work performance."
J.A. 380. The court emphasized that Okoli over-read certain

---

[4]Okoli told Phillips that she had provided enough information and
declined to go into more detail about inappropriate touching. Okoli and
Phillips also discussed various ways to resolve the situation, including
being placed in a new job or contacting another state agency.

inferences and innocuous gifts, and cited cases where similar or "more egregious" conduct did not constitute a hostile work environment. J.A. 381-82 (citing *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745 (4th Cir. 1996); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333 (7th Cir. 1993)).

Second, regarding quid pro quo, the district court found that there was a legitimate basis to fire Okoli due to "performance issues," namely her attitude, errors, and absence. J.A. 385. The court found these to be valid grounds for terminating an at-will employee and concluded that her other allegations of adverse actions were not actionable.

Third, regarding retaliation, the district court found that it was "questionable whether the sending of this letter [to the Mayor] constitutes 'protected activity,'" because Okoli made "simply a general complaint about Stewart's unprofessional behavior . . . ." J.A. 389. Even assuming this was protected activity, the court found the retaliation claim failed because Stewart made the decision to terminate her before she sent the letter. The court relied on a computer file's timestamp to establish this fact.

## II.

"In reviewing the grant or denial of a motion for summary judgment, an appellate court conducts a de novo review . . . ." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). We draw "[a]ll inferences . . . in a light most favorable to the non-movant." *Id.*

## A.

First, Okoli alleges she was subject to a hostile work environment. "To demonstrate sexual harassment and/or a racially hostile work environment, a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on the plaintiff's sex [and/or race]; (3) which is sufficiently severe or pervasive

to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334 (4th Cir. 2010) (alteration in original) (quoting *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 192 (4th Cir. 2000)).

The third factor is dispositive here: whether Stewart's treatment was severe or pervasive enough. The City contends it was not, characterizes Stewart's conduct as sporadic and infrequent, depicts Stewart as promptly stopping this conduct once Okoli objected, and questions whether some of Stewart's comments and gifts were sexual at all.

We conclude that Okoli presents a strong claim for hostile work environment. Here, we look to the totality of the circumstances, including the "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). Viewing the facts in the light most favorable to Okoli, she suffered upwards of twelve (12) incidents in just four months: (1) disparaging jokes about gays and lesbians; (2) comments about Okoli and Jacuzzi fantasy; (3) comments about Okoli and group sex fantasy; (4) questions about Okoli's underwear; (5) comments about sexual relations with another African-American woman; (6) additional inquiries about Okoli sitting on lap and Jacuzzi fantasy; (7-10) three incidents of fondling her leg under a table; (11) forcible kissing; (12) more propositions to join in a Jacuzzi fantasy. These events took place from September 8 through January 11. Functionally, these incidents span fondling, kissing, propositioning, describing sexual activities, and asking intimate ques-

tions. Some of the incidents may have been severe enough to be actionable in and of themselves.[5]

Collectively, Okoli was subject to repeated propositioning and physical touching. By any objective and reasonable standard, the allegations here are far beyond "simple teasing [and] offhand comments." *Faragher*, 524 U.S. at 788 (internal quotation marks omitted). Moreover, Stewart's alleged conduct is much more than "'generalized' statements that pollute the work environment"—they clearly constitute "'personal gender-based remarks' that single out individuals for ridicule." *EEOC v. Fairbrook Med. Clinic*, 609 F.3d 320, 328-29 (4th Cir. 2010). Indeed, the conduct here is arguably at least as severe as conduct we have previously deemed to be actionable. *See, e.g.*, *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 336 (4th Cir. 2010) (gender-based language, songs, and comments); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 696 (4th Cir. 2007) (en banc) (coach's explicit inquiries into and comments about student athletes' sexual lives); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 243 (4th Cir. 2000) (repeated remarks that belittled employee because she was a woman). Here too, there is a significant "disparity in power," *Jennings*, 482 F.3d at 697: Stewart is a political appointee who sits in the Mayor's cabinet and heads an agency with more than a hundred employees. Okoli was a new secretary whose job required her to have a lot of one-on-one contact with her boss.

---

[5]*See, e.g.*, *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (indicating that "a single incident [of sexual harassment that] was extraordinarily severe" can be actionable); *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007) (same); *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (same); *Bowen v. Missouri Dep't of Soc. Servs.*, 311 F.3d 878, 884 (8th Cir. 2002) ("A claimant need only establish discriminatory conduct which is either pervasive or severe."); *Smith v. Norwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997) (same); *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1146 (11th Cir. 2008) (same) (citations omitted).

Furthermore, the sexual advances here were more numerous and explicit than in *Beardsley v. Webb*, which Okoli cites. In *Beardsley*, we found a hostile work environment when, over six months, a supervisor massaged an employees shoulders, stated he wanted to "make out" and "have his way" with her, falsely accused her of having an affair, and asked her about her underwear, birth control, and the bodily effects of taking maternity leave. 30 F.3d 524, 528-29 (4th Cir. 1994).[6] Additionally, this case involves more severe accusations of sexual harassment than the pre-*Jennings* cases which the district court and City cited.[7]

Finally, the district court's reasoning was flawed in two other ways. First, the court over-emphasized the role of Stewart's gifts in light of the extensive remarks and touching here. Some of those gifts, such as a holiday card, flag, or tea set, may seem innocuous when viewed alone or out of context. But our legal analysis "requires careful consideration of the

---

[6]The City attempts to distinguish *Beardsley* because the defendant there had "unequivocally rejected every advance," whereas here Okoli was more tepid and already had poor performance. While some of Okoli's early responses are somewhat general, she explicitly told Stewart she was not interested in a sexual relationship on January 11, 2005.

[7]The City points to *Hopkins*, where we found no hostile work environment existed when, over a seven year period, a supervisor "bumped into [an employee], positioned a magnifying glass over his crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [the employee's] wedding, and stared at him in the bathroom . . . [but n]ever made an overt sexual proposition or touched [the employee] in a sexual manner." 77 F.3d at 753. Here, by contrast, the conduct transpired during just over four months, and included more physical contact, more sexual propositions, and more explicit language.

Nor is this case *Weiss*, where the Seventh Circuit found no hostile work environment when a supervisor asked an employee out on dates, called her a "dumb blond," touched her shoulder several times, posted "I love you" signs, and tried to kiss her at a bar. 990 F.2d at 334. Stewart's advances were graphic sexual propositions—not innocuous requests for "dates." Moreover, Stewart's comments were far more sexually explicit, and his touching of her leg more intimate, invasive, and unseen.

social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998). Here, Okoli alleges Stewart was engaging in an escalating pattern of sexual advances. Gifts could certainly have been a part of his effort to coerce Okoli into having sex. A gift which may seem harmless in the abstract can have sexual connotations when delivered with a suggestive comment (this flag is "[ ]sign of bigger and better things to come," J.A. 88) or symbol (i.e., a phallic or sexual allusion).

Second, the district court reasoned that Stewart's advances could not have interfered with Okoli's work since she had a high opinion of her performance. But this conflates aspects of Stewart's hostile work environment and retaliation claims. Okoli can argue that Stewart negatively impacted her work, while still defending her performance against the City's attempt to show a legitimate basis for firing her. Indeed "[t]he fact that a plaintiff continued to work under difficult conditions is to her credit, not the harasser's." *EEOC v. Fairbrook Med. Clinic*, 609 F.3d at 330. Overall, Okoli presents a strong claim for hostile work environment, when "objective[ly viewing the] severity of harassment . . . from the perspective of a reasonable person in the plaintiff's position." *Oncale*, 523 U.S. at 81.

## B.

Second, Okoli claims she experienced quid pro quo discrimination. This requires an employee prove five elements:

1   The employee belongs to a protected group.

2   The employee was subject to unwelcome sexual harassment.

3   The harassment complained of was based upon sex.

4    The employee's reaction to the harassment affected *tangible aspects* of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

5    The employer, as defined by Title VII, 42 U.S.C. § 2000e(b), knew or should have known of the harassment and took no effective remedial action.

*Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999) (emphasis added, citations omitted). With the fourth element, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). The fifth element is "automatically met" when the harassment was alleged to have been perpetrated by a supervisor. *Spencer v. General Elec. Co.*, 894 F.2d 651, 658 n.10 (4th Cir. 1990).

If the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006). Then, if the employer satisfies its burden, the burden returns to the plaintiff to establish that the employer's proffered reason is a pretext for discrimination. *Baqir*, 434 F.3d at 747.

In this case, the inquiry turns on the fourth factor: whether Okoli's reaction to Stewart's advances affected "tangible aspects" of her employment. The parties focus mostly on whether Stewart's decision to conduct an informal performance feedback—as opposed to a formal, periodic performance review—was "tangible" enough. Performance reviews are clearly related to employment and promotion. But the record contains no details about what reviews are standard or required by office policy. The more "tangible" employment action taken by Stewart was Okoli's allegation that Stewart fired her for rejecting his advances and complaining about his conduct.

The City also maintains it had a legitimate non-discriminatory reason for terminating Okoli that has not been shown to be pretextual. Okoli must then show that the proffered reason is false: "'In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.'" *Washington v. City of Charlotte*, 219 Fed. Appx. 273, 279 (4th Cir. 2007) (unpublished) (Gregory, J., dissenting) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). "'[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.'" *Id.* at 279-80 (quoting *Reeves*, 530 U.S. at 147).

In this case, there is some evidence that Okoli occasionally had scheduling conflicts and made typographical errors. But it appears deeply suspicious that Stewart fired Okoli only hours after she culminated her rejection of him by complaining to the Mayor. There is little in the record to suggest Okoli would have been fired for the occasional typo, notwithstanding her "at-will" employment status. Specifically, Stewart and Okoli's last disagreements were about whether to meet at 8:30 AM instead of 8:00 AM and 2:15 PM instead of 2:10. J.A. 73-75, 120-22, 146. It is hard to believe those lone scheduling

conflicts were so egregious as to provide a legitimate basis for firing Okoli the same afternoon she complained about harassment. "[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration . . . ." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (emphasis in original).

## C.

Third, Okoli maintains that Stewart retaliated against her. "To state a prima facie case of retaliation, a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997) (citing *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)).

The parties disagree centrally about whether Okoli's April 1 letter to the Mayor constituted protected activity because it did not explicitly mention sexual harassment. The City also emphasizes that Stewart decided to fire Okoli before she complained, as evinced by his deposition and the timestamp on the computer file he used to fire her. Okoli's previous complaints are insufficient, according to the City, because they were too vague or too long before she was ultimately fired.

Here, it was enough for Okoli to twice complain of "harassment," even if it might have been more ideal for her to detail the sexual incidents she later relayed.[8] While Okoli's January

---

[8]Several sister circuits have noted that sexual harassment complaints need not include "magic words" such as "sex" or "sexual" to be effective. *See, e.g.*, *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) ("While no 'magic words' are required, the complaint must in some way

26 email to Gillard referenced only a "complaint," her March 23 email was entitled "*Harassment* Complaint." J.A. 171 (emphasis added). Okoli's April 1 memo to the Mayor further described "unethical and unprofessional business characteristics, e.g., *harassment*, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues (anyone in the City government) and lack or disregard for integrity." J.A. 197 (emphasis added).

The City surely should have known that Okoli's complaints of "harassment" likely encompassed sexual harassment.[9] Indeed, Okoli's description of "unethical," "degrading and dehumanizing" conduct suggest severe misbehavior related to her identity—not a mere workplace squabble. Moreover, based on his alleged conduct, Stewart himself surely would have known that Okoli was complaining of sexual harassment.

Finally, the district court improperly inferred that Stewart had intended to fire Okoli before she complained simply because his Word document, "Katrina[ Okoli].doc" was created on March 23. The court did so largely on the basis of a CARE technician who stated that the file properties show it was created on March 23 and modified on March 31. To therefore infer that Stewart necessarily intended to fire Okoli for legitimate reasons on March 23 was clear error. That a computer file was created on a certain day tells us nothing about its contents on that day. It is entirely possible "Katrina.doc" could have been blank—or contained an unre-

---

allege unlawful discrimination, not just frustrated ambition."); *Olson v. Lowe's Home Ctrs. Inc.*, 130 Fed. Appx. 380, 391 n.22 (11th Cir. 2005) (unpublished) ("There is no magic word requirement. That is, the employee need not label the events 'sexual harassment' in order to place an employer on notice of the offending behavior.").

[9]Courts and employers generally understand "harassment" to be a term of art. *See, e.g.*, *Barbour v. Browner*, 181 F.3d 1342, 1355 (D.C. Cir. 1999) (discussing "the legal term of art 'harassment.'").

lated or favorable review of her work, which Stewart later modified. Indeed there is already evidence in the record that Stewart modified his letter three times before delivering it. Okoli's second amended complaint alleges that Stewart typed up a termination letter *after* reading her complaint. Viewing the evidence in the light most favorable to Okoli, we can infer that Stewart did not intend to fire her before April 1—and therefore a genuine dispute of material fact still exists on this front.

Moreover, it is undisputed that Stewart actually fired Okoli only after learning of her complaint. This is unaffected by the fact that he may or may not have had a draft termination letter on his computer beforehand. Even assuming Stewart previously contemplated firing her—Okoli's complaint might have been an additional or superseding cause of her ultimate termination. Regardless, Okoli presented more than an adequate claim that her complaint was "causally connected to the employer's adverse action." *Beall*, 130 F.3d at 619. Any dispute about Stewart's alternative, legitimate basis for firing her returns to the question of mixed-motives and pretext. For the purposes of summary judgment, Okoli has eliminated legitimate reasons for her firing, so "it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration . . . ." *Furnco*, 438 U.S. at 577. We now return this case to a jury to assess and resolve Okoli's three claims.

### III.

For these reasons, the grant of summary judgment is vacated and the case is remanded for further proceedings.

*VACATED AND REMANDED*

WYNN, Circuit Judge, concurring in part and concurring in the judgment:

In this case, Katrina Okoli ("Okoli") was fired after rejecting what she alleged to be persistent sexual advances, of both

a verbal and physical nature, made by her supervisor, John Stewart ("Stewart"). I agree with the majority that, when the evidence is viewed in the light most favorable to Okoli, the nature and prevalence of Stewart's alleged advances was sufficient to support a hostile work environment claim under Title VII. That said, I differ somewhat in my analysis of the causal link between Okoli's opposition to those sexual advances and the adverse employment action eventually taken against her. Ultimately, however, I too would conclude that the district court erred in granting summary judgment to the defendants regarding Okoli's *quid pro quo* and retaliation claims.

## I.

Under Title VII, it is illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. This language encompasses a prohibition on sexual harassment in the workplace. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64-65 (1986). Because Okoli brought both a "*quid pro quo*" claim and a "hostile work environment" claim, this case requires us to address two distinct types of workplace sexual harassment that constitute intentional discrimination in violation of Title VII.

The terms "*quid pro quo*" and "hostile work environment" are absent from the statutory text of Title VII. As recognized by the Supreme Court,

> The terms appeared first in the academic literature, see C. MacKinnon, Sexual Harassment of Working Women (1979); found their way into decisions of the Courts of Appeals, see, *e.g.*, *Henson v. Dundee*, 682 F.2d 897, 909 (C.A.11 1982); and were mentioned in this Court's decision in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986). See generally E.

Scalia, The Strange Career of *Quid Pro Quo* Sexual
Harassment, 21 Harv. J.L. & Pub. Policy 307 (1998).

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752
(1998). In her book, Professor MacKinnon distinguished
between "harassment that creates an offensive environment
('condition of work' harassment) and harassment in which a
supervisor demands sexual consideration in exchange for job
benefits ('*quid pro quo*')." *Henson*, 682 F.2d at 908 n.18 (cit-
ing C. MacKinnon, Sexual Harassment of Working Women
32-47 (1979)). In 1983, this Court adopted the dichotomy
suggested by Professor MacKinnon and agreed that there are
these "two basic varieties" of sexual harassment. *Katz v. Dole*,
709 F.2d 251, 254 (4th Cir. 1983) (citing *Henson*, 682 F.2d
at 908 n.18), abrogated on other grounds as recognized in
*Mikels v. City of Durham, N.C.*, 183 F.3d 323 (4th Cir. 1999).

In 1986, a useful distinction between so-called *quid pro
quo* claims and hostile work environment claims was drawn
by the Supreme Court in *Meritor*. Essentially, the court was
asked to rule on whether a claim of "hostile environment"
sexual harassment is a form of actionable sex discrimination
under Title VII. More precisely, the Court considered whether
constructive changes to the conditions of employment, absent
evidence of direct financial injury[1], could support Title VII
liability. The Court noted that the EEOC's Guidelines sup-
ported the conclusion that sexual misconduct violates Title
VII "whether or not it is directly linked to the grant or denial
of an economic *quid pro quo*, where 'such conduct has the
purpose or effect of unreasonably interfering with an individ-
ual's work performance or creating an intimidating, hostile, or

---

[1]The Court was responding to Petitioner's contention "that in prohibit-
ing discrimination with respect to 'compensation, terms, conditions, or
privileges' of employment, Congress was concerned with what petitioner
describes as 'tangible loss' of 'an economic character,' not 'purely psy-
chological aspects of the workplace environment.'" *Meritor*, 477 U.S. at
64.

offensive working environment.'" 477 U.S. at 65 (quoting 29 C.F.R. § 1604.11(a)(3)). The Court ultimately held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.* at 66; *see also id.* at 65 (referring to these claims as involving "so-called 'hostile environment' (i.e. non *quid pro quo*) harassment").

After *Meritor*, the Supreme Court has instructed that "[t]he principal significance of the distinction [drawn therein between *quid pro quo* claims and hostile work environment claims] is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive." *Burlington*, 524 U.S. at 752. In *Burlington*, the Court considered whether, when an employer threatens to retaliate against an employee if she denies him sexual liberties, Title VII liability exists if the threat is not carried out. The Court concluded that even when the employer does not act on such a threat, if the sexual harassment is sufficiently severe or pervasive, liability can exist on the theory that the harassment constructively altered the employee's conditions of employment by creating a "hostile work environment." *Id.* at 753-54. The Court stated that, the labels "*quid pro quo*" and "hostile work environment," when applied to a sexual harassment claim, "illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general." *Id.* at 753.[2]

---

[2]The distinction was drawn because, as the *Burlington* court recognized, it affected questions regarding an employer's vicarious liability. When a supervisor takes a "tangible employment action" (defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," 524 U.S. at 761) against an employee, vicarious liability for the employer is automatic. *Id.* at 762-63. When no tangible employment action is taken, vicarious liability exists subject to a two-pronged affirmative defense. *Id.* at 765 ("The defense comprises two necessary elements: (a) that the employer exercised reason-

## II.

I agree with the majority that, when viewed in the light most favorable to Okoli, the litany of unwelcome sexual advances allegedly made by Stewart was sufficiently severe and pervasive to alter the conditions of Okoli's employment by creating a hostile work environment.[3] Moreover, I agree that Okoli's firing constituted a tangible employment action. In other words, drawing every inference in her favor, Okoli has demonstrated both constructive and explicit changes to the terms and conditions of her employment. To recover for the latter, however, Okoli must demonstrate that her rejection of Stewart's sexual advances was the basis for the decision to terminate her "at will" employment contract.

Perhaps due to Professor MacKinnon's initial conception of "*quid pro quo*" harassment, courts have sometimes insinuated that to recover on that theory, a plaintiff must demonstrate that the receipt of a job benefit was conditioned on acceptance

able care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."); *see also Reinhold v. Com. of Va.*, 151 F.3d 172 (1998).

[3]I do not believe, however, that certain "gifts such as coats, lunch, and a holiday greeting card containing cash" given to Okoli contributed to the hostility of her work environment. Indeed, Okoli does not dispute that Stewart often took his employees to lunch for their birthday and gave his employees Christmas gifts, often of cash. Nor does Okoli dispute that, after Stewart's mother died, he distributed a number of his mother's personal belongings to the staff at C.A.R.E.. He gave Okoli some used coats for her daughters as well a used bowling ball. Still, even without consideration of these gifts, the record indicates that Okoli subjectively perceived numerous sexual advances by Stewart as creating an abusive work environment, and I agree with the majority that Stewart's alleged sexual harassment was "of the type that would interfere with a reasonable person's work performance . . . to the extent required by Title VII." *Morgan v Mass. Gen. Hosp.*, 901 F.2d 186, 193 (1st Cir. 1990).

of a supervisor's sexual advance. *See, e.g.*, *Spencer v. Gen. Elec. Co.*, 894 F.2d 651, 658 (4th Cir. 1990) (defining "*quid pro quo* sexual hararassment" as that in which "sexual consideration is demanded in exchange for job benefits"), abrogated on other grounds, *Farrar v. Hobby*, 506 U.S. 103 (1992); *Katz*, (defining "*quid pro quo* sexual harassment" as "harassment in which a supervisor demands sexual consideration in exchange for job benefits . . . ." (quoting *Henson*, 682 F.2d at 908 n.18)).

In this case, there was no evidence that Stewart ever expressly conditioned Okoli's job or the benefits thereof on her acceptance of his sexual advances.[4] *Cf. Burlington*, 524 U.S. at 747-48 (supervisor warned employee who gave no encouragement to sexual commentary to "loosen up" because he "could make [her] life very hard or very easy at Burlington"); *Katz*, 709 F.2d at 254 ("Uncontradicted testimony by Katz indicated that the supervisor . . . once stated in her presence that he would consider accepting her transfer to his crew because of her sexual abilities."). Indeed, even when viewed in the light most favorable to Okoli, there is scant evidence that such a condition was even implied.[5] *See Brown v. Perry*,

---

[4]Okoli did assert in her complaint that "Plaintiff was led to belief by Mr. Stewart that her employment opportunities would be enhanced if she accepted the sexual advances." J.A. 10. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.) However, she failed to point to a single instance in which Stewart expressly indicated any causal connection between her acceptance or rejection of his advances and any potential change to the conditions of her employment. In fact, Okoli herself indicated that when Stewart propositioned her he would say "Okay, but you know this doesn't mean you get any perks." J.A. 107.

[5]It is of course difficult to state as a matter of law that a certain body of evidence fails to support an implication. However, the standard on summary judgment requires us to draw "all reasonable inferences" in favor of Okoli. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir. 1987). Nothing in the record can be reasonably inferred to indicate that Stewart's actions or comments impliedly conditioned Okoli's job benefits

184 F.3d 388, 393 (4th Cir. 1999) (stating that *quid pro quo* claim can be established when acceptance of harassment is an "express *or implied* condition to the receipt of a job benefit") (emphasis added).

However, that observation does not bar recovery. Instead, liability for discrimination on a *quid pro quo* theory can be established when "rejection of the harassment [is the] cause of a tangible job detriment." *Id.* at 393; *see also Burlington*, 524 U.S at 753-54 ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."); 29 C.F.R. § 1604.11(a) ("Unwelcome sexual advances, requests for sexual favors, and other verbal or physical con- duct of a sexual nature constitute sexual harassment when . . . submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual . . . .").

Okoli argued that she was fired for refusing Stewart's advances. The City proffered non-discriminatory reasons for Okoli's discharge which the majority appears to cast as mere pretext for discrimination. While we must view the evidence in the light most favorable to Okoli, I would allow a jury to decide whether the City's reasons for Okoli's termination were transparently false or facially illegitimate. Assuming arguendo that Okoli made a prima facie case for *quid pro quo* sexual harassment, I would hold that the City effectively

---

on her acquiescence to his advances. *Cf. Spencer*, 894 F.2d at 659 (finding that prima facie *quid pro quo* claim was established where plaintiff pro- duced evidence that a female co-worker who succumbed to sexual demands of their employer received promotion but plaintiff refused sexual demands and was denied a promotion to a position that remained unfilled, thus evidencing, through implication, the existence of an impermissible condition).

rebutted the presumption of harassment created by the prima facie case. It bears mention that to effectively rebut the presumption, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (citation omitted). I would conclude that the City's showing was sufficient to raise that issue of fact. However, because a jury could credit Okoli's evidence indicating that the City's proffered reasons were pretextual, I would conclude that it should be for the jury to determine whether the City's non-discriminatory reasons were the true motivation for Okoli's termination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973) (establishing the burden shifting scheme which controls Title VII discrimination claims). Accordingly, I would hold that the district court erred in granting summary judgment in favor of the City.

Okoli was hired on June 21, 2004, as an Assistant to the Executive Director of C.A.R.E., a position requiring her to provide "staff assistance and confidential secretarial and administrative support to the Executive Director." J.A. 65. The job required her to, *inter alia*, maintain the Executive Director's files and schedule as well as compose correspondence, reports, and memoranda for the Executive Director. She was expected to "deal with employees . . . with tact and courtesy," and "deal with confidential materials and situations with discretion." J.A. 66. Okoli does not dispute that she was hired as an "at will" employee, meaning that she could be fired for "no reason or any reason at all-except an unlawful reason." *Smith v. Frye*, 488 F.3d 263, 277 (4th Cir. 2007) (Motz, J., concurring in part and concurring in the judgment).

There is also no dispute that the first few months of Okoli's employment went well. However, according to Stewart's affidavit, even as early as September 30, 2004, he had to counsel Okoli on the requirements of her position after she discussed

confidential lay-offs with co-workers.[6] Stewart claims that even at the early stages of Okoli's tenure he noticed clerical errors on outgoing correspondence for which Okoli was responsible.[7] In early January 2005, Stewart asserts that he gave Okoli an informal performance evaluation to indicate areas in which she needed improvement. Stewart claims that during the evaluation, he explained to Okoli that she needed to (1) correct persistent clerical errors in outgoing correspondence, (2) stop criticizing the work product of the Bureau Chiefs that worked under Stewart, (3) implement a filing system, (4) improve her time management skills, and (5) clean up her cluttered office. Stewart stated that after this performance review, Okoli became uncooperative and defiant while demonstrating no improvement in the areas of concern.

On January 24, 2005, Stewart "formally counseled [Okoli] about her performance." J.A. 72. According to Stewart, he reiterated the need for her to improve her proofreading and typing. He advised her that he would consider disciplinary action, including termination, if she did not improve.

Stewart maintained that on February 14, 2005, he was preparing to distribute documents supposedly proofread by Okoli to the Baltimore City delegation to the Maryland General Assembly when he noticed that there were several errors in the documents. He claims he again spoke to Plaintiff regarding her performance.

According to Stewart, on March 1, 2005, Plaintiff left the office without telling him, although he later learned from C.A.R.E.'s receptionist that Plaintiff had gone to take her

---

[6]Okoli does not dispute that she disclosed this confidential information; instead she asserts that Stewart unfairly criticized her for the disclosure as retaliation for her opposition of his sexual advances.

[7]For instance, the record includes a number of emails sent by Okoli in early November 2004 which were returned because Plaintiff entered an incorrect email address.

child to school. He instructed the receptionist to tell Plaintiff to see him immediately upon her return. Plaintiff received the message, but did not report immediately as instructed. Stewart claims he later confronted Plaintiff about being AWOL and told her that it constituted grounds for termination. According to Stewart, after this incident he spoke to the City's Department of Human Resources about the possibility of terminating Okoli. The record includes a letter drafted by Monica Wilson, a member of the City's Department of Human Resources, confirming that Stewart came to her office to discuss Okoli's unexcused absence. According to Wilson, "Stewart said that [Okoli] had not discussed [her anticipated absence from work] with him; that this was not the first incident of [Okoli] leaving the worksite for extended periods of time without his permission and that he had spoken to her about it prior to this date." J.A. 153.

On March 23, 2005, Okoli demonstrated what Stewart saw as unacceptably insubordinate behavior. When Stewart arrived and asked her at 8:10 to assist in the preparation of documents for a meeting that morning, Okoli refused, stating that she would not assist him until 8:30. After returning from the meeting, Stewart asked Okoli to meet with him at 2:10. Okoli refused, stating that her lunch hour would not be over until 2:15. When Okoli finally met with Stewart, he informed her that her insubordination and "failure to improve her performance" constituted grounds for her termination.

Stewart avers that he had another of his employees draft a termination letter for Okoli later on March 23. He claims that it was his intention to terminate Okoli's employment the next day. However, on March 24, Okoli took a day off. The next day was Good Friday, and Okoli had scheduled vacation for the following Monday through Wednesday. Okoli took a sick day on Thursday. Accordingly, the next day that she was in the office was April 1, 2005, the day when she was terminated.[8]

---

[8]Okoli does not dispute that she was absent from the office from March 24 until April 1.

Frank Johnson, the C.A.R.E. employee to whom Stewart delegated the task of drafting the termination letter, confirmed that it was initially drafted days before Okoli's termination, although he couldn't remember the exact date.[9]

In light of this evidence, I would hold that the City carried its burden of production by setting forth "'through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Burdine*, 450 U.S. at 255). The question then becomes whether Okoli presented sufficient evidence to indicate that the City's proffered reasons for firing her were mere pretext. To avoid judgment as a matter of law on the question of whether an employer's proffered reason was merely pretext and that opposition to sexual harassment was the real reason for her termination, Okoli must establish a "'legally sufficient evidentiary basis for a reasonable jury to find for [her].'" *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278-79 (4th Cir. 2000); *see also Burdine*, 450 U.S. at 256 (stating that notwithstanding the burden shifting scheme, the plaintiff retains the

---

[9]There is arguably a question as to whether, when viewed in the light most favorable to Okoli, the evidence can support a reasonable inference that the decision to terminate her was made on March 23. However, in addition to the testimony of Johnson, who drafted Okoli's termination letter, and Stewart, who made the termination decision and ordered the letter drafted, the record includes the affidavit of Lisa Veale, who stated that Stewart "shared with me the desire to terminate Okoli due to her performance and attitude prior to her termination date." J.A. 84. Admittedly, the fact "[t]hat a computer file was created on a certain day tells us nothing about its contents on that day." However, the record also includes a "termination letter" dated March 24, 2005, indicating that Okoli's at will position would be terminated "effective March 28, 2005." J.A. 184. I question whether, even viewing all the evidence in the light most favorable to Okoli, there can be, in light of the evidence presented by Defendants, a reasonable dispute regarding whether the decision to fire Okoli was made before or after Stewart gained knowledge of Okoli's letter to the Mayor on April 1, 2005.

"ultimate burden of persuading the [trier of fact] that [she] has been the victim of intentional discrimination").

As summarized above, the City contended that Okoli was fired for her failure to correct repeated performance issues and for her increasing insubordination. The bulk of Okoli's response is constituted of disagreement regarding the alleged deficiencies in her work performance. For instance, Okoli asserts that "in [her] nine months at CARE, there were no outgoing documents with even a single error." J.A. 94. She also claims, regarding her absenteeism, that "Stewart advised [her] as early as [her] interview that [she] could work anytime that [she] wanted as long as [she] worked [her] allotted hours." J.A. 96. Additionally, Okoli challenges the City's assertion that Stewart addressed performance concerns with her prior to her termination.[10] Finally, Okoli's allegations that she was repeatedly harassed are relevant to the contention that the City's proffered reasons for her termination were pretextual. *See McDonnell Douglas*, 411 U.S. at 804 (stating that "facts as to the [employer's] treatment of [an employee] during his prior term of employment" can be relevant to a showing of pretext).

Okoli also generally opines that she performed well while employed at C.A.R.E.. However, this merely indicates that she disagreed with her supervisor's assessment of her performance. When considering whether an employee's perfor-

---

[10]Okoli asserts that "[Stewart] never told me to improve in any areas and thus, he never gave me any verbal or written documentation addressing performance, attitude or discipline." J.A. 96. Curiously, however, the record includes Okoli's handwritten notes from January 25, the date Stewart claims he conducted Okoli's formal evaluation. While those notes do not mention errors in documents drafted by Okoli, they indicate that Stewart expressed displeasure with her unexcused and unannounced absence and stated that she could be terminated for failure to call to explain future absences. Moreover, Lisa Veale stated in her affidavit that she "sat in on a couple of meetings when [Stewart] spoke to Okoli about issues with her performance." J.A. 82.

mance was the motivation for an adverse employment action, "'[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" *Hawkins v. PespiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

In sum, two competing stories were proffered about the City's reason for firing Okoli, and there was evidence which, if proven at trial, would permit a jury to believe either story. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As such, I agree that Okoli's claim for *quid pro quo* harassment should have survived the City's motion for summary judgment.

### III.

Title VII also makes it illegal "for an employer to discriminate against any of his employees . . . because he opposed any practice made an unlawful employment practice by this title . . . ." 42 U.S.C. § 2000e-3. As noted above, *supra* n.9, I question whether a reasonable inference can be drawn from the evidence that the decision to terminate Okoli was made on April 1. However, even assuming *arguendo* that the decision to fire her was made, as the City claims, on March 23, I would still hold that the district court erred in granting summary judgment for the City on Okoli's retaliation claim.

To prove a prima facie case of retaliation, Okoli was required to demonstrate that "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001). As the

majority observes, the April 1 letter to the Mayor was not the first attempt made by Okoli to use official channels to complain about Stewart's actions. I agree that the undisputed fact that Okoli twice sent emails to City personnel complaining of "harassment" was sufficient to establish that she engaged in protected activity. Because she was subsequently fired, Okoli need only demonstrate that a causal connection existed between her opposition to Stewart's actions and the decision to terminate her. As explained above, an unresolved factual dispute as to the reasons for Okoli's termination made summary judgment for the City inappropriate.

## IV.

In sum, I would hold that there is an unresolved factual dispute regarding the cause for Okoli's termination. In other words, I cannot conclude as a matter of law that Okoli failed to demonstrate the requisite causal connection. As such, I agree with the majority that summary judgment in favor of the City was inappropriate.